**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

GARY DRANCH,
28 High Point Lane
Scarsdale, NY 10583,

Derivatively on behalf of MEDICAL PROPERTIES TRUST, INC.,

Plaintiff,

v.

EDWARD K. ALDAG, JR.,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

R. STEVEN HAMNER,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

J. KEVIN HANNA,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

G. STEVEN DAWSON,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

ELIZABETH N. PITMAN,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

D. PAUL SPARKS, JR.,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

MICHAEL G. STEWART,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

*continued on following page*

Case No.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

C. REYNOLDS THOMPSON, III,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

CATERINA A. MOZINGO,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

and

EMILY W. MURPHY,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

Defendants,

and

MEDICAL PROPERTIES TRUST, INC.,
a Maryland corporation,
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

Serve:
The Corporation Trust Inc.
2405 York Road, Suite 201
Lutherville Timonium, MD 21093

Nominal Defendant.

Plaintiff Gary Dranch ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Medical Properties Trust, Inc. ("MPT" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers, seeking to remedy defendants' breaches of fiduciary duties, insider selling, and unjust enrichment. Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by MPT with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I. NATURE AND SUMMARY OF THE ACTION

1. MPT is a self-advised real estate investment trust ("REIT") that was formed to acquire and develop healthcare facilities and lease those facilities to healthcare operating companies under long-term net leases. The Company's largest tenants with this sale-leaseback arrangement were Steward Health Care System, LLC ("Steward"), representing nearly 25% of MPT's total assets, and Prospect Medical Holdings, Inc. ("Prospect"), representing nearly 9.5% of MPT's total assets.

2. The Individual Defendants (defined herein) assured investors that the Company regularly monitored the financial performance of its lessees and assessed the value of its real estate assets. However, for years, they ignored red flags indicating that Steward and Prospect were financially distressed and would be unable to meet their lease payment obligations, thereby overstating the value of the Company's assets.

3. On January 26, 2023, Viceroy Research published a report that claimed MPT engaged in uncommercial round-trip transactions with tenants, including Steward and Prospect, to avoid recording impairment charges by enabling tenants to meet their short-term rent obligations.

4. Shortly thereafter, on February 23, 2023, before the market closed, MPT announced a $283 million impairment charge in the fourth quarter of 2022 consisting of a real estate impairment of approximately $171 million related to four Prospect-leased properties and a write-off of roughly $112 million in unbilled Prospect rent. On this news, the Company's stock price fell approximately 8.7% to close at $11.14 per share on February 23, 2023, on unusually heavy trading volume.

5. On November 9, 2023, the Company revealed that Steward had only paid a portion of its October rent, indicating that it was under financial distress that led to defaults on its rental obligations.

6. Then, on January 4, 2024, the Company reported that it expected to record a $225 million write-off of rent receivables due from Steward. On this news, the Company's stock price fell approximately 29% to close at $3.55 per share on January 5, 2024, on unusually heavy trading volume.

7. These revelations precipitated the filing of a securities class action in the U.S. District Court for the Northern District of Alabama against the Company, the Operating Partnership (defined herein), and certain of its corporate fiduciaries captioned *Pirani v. Medical Properties Trust, Inc. et al.*, Case No. 2:23-cv-00486-CLM (the "Securities Class Action").

8. Prior to initiating this litigation, Plaintiff served a litigation demand pursuant to Maryland law asking the Board to investigate whether Company fiduciaries were at fault for the alleged harm to MPT and institute legal action (the "Demand"). In response, the Board refused to

act in response to the Demand, choosing to defer consideration of the Demand without conducting any investigation.

9. For these reasons and as set forth in greater detail herein, including the Board's refusal to act in response to the Demand, Plaintiff seeks to hold accountable the Individual Defendants who abandoned their fiduciary duties and are liable for the financial and reputational harm suffered by MPT and its shareholders.

## II. JURISDICTION AND VENUE

10. This Court has original jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332. Subject matter jurisdiction is proper because the amount in controversy exceeds $75,000, exclusive of interest and cost, and the named Plaintiff and Defendants are citizens of different states. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because MPT is a Maryland corporation.

## III. PARTIES

**Plaintiff**

12. Plaintiff Gary Dranch currently owns MPT common stock and has continuously owned MPT stock since April 2021. Dranch is a citizen of New York.

**Nominal Defendant**

13. Nominal Defendant MPT is a Maryland corporation with its principal executive offices located at 1000 Urban Center Drive, Suite 501, Birmingham, AL 35242. Its common stock trades on the New York Stock Exchange ("NYSE") under the symbol "MPW."

**Defendants**

14. Defendant Edward K. Aldag, Jr. ("Aldag") is the Company's founder and has served as the Company's Chief Executive Officer ("CEO") and President since August 2003, and as Chairman of the Board since March 2004. Additionally, Aldag has served as Chairman of MPT's Investment Committee since at least 2018. Aldag is a citizen of Alabama.

15. Defendant R. Steven Hamner ("Hamner") is one of the Company's co-founders and has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since September 2003. Additionally, Hamner has served as a member of MPT's Investment Committee since at least 2018. Hamner is a citizen of Texas.

16. Defendant J. Kevin Hanna ("Hanna") has served as the Company's Vice President, Controller and Chief Accounting Officer ("CAO") since at least January 2016. Hanna is a citizen of Alabama.

17. Defendant G. Steven Dawson ("Dawson") has served as a director of the Company since April 2004. Dawson has also served as the Chairman of the Company's Audit Committee since April 2004, and as a member of MPT's Investment Committee since at least 2018. Dawson is a citizen of Alabama.

18. Defendant Elizabeth N. Pitman ("Pitman") has served as a director of the Company since February 2018. Pitman is a citizen of Alabama.

19. Defendant D. Paul Sparks, Jr. ("Sparks") has served as a director of the Company since September 2014. Sparks has also served as a member of the Audit Committee since at least May 2016, and as a member of MPT's Investment Committee since at least 2018. Sparks is a citizen of Alabama.

20. Defendant Michael G. Stewart ("Stewart") has served as a director of the Company since August 2016. Stewart is a citizen of Alabama.

21. Defendant C. Reynolds Thompson, III ("Thompson") has served as a director of the Company since August 2016. Thompson has also served as a member of the Audit Committee since at least May 2017. Thompson is a citizen of Alabama.

22. Defendant Caterina A. Mozingo ("Mozingo") has served as a member of the Board since February 2020. Mozingo is a citizen of Alabama.

23. Defendant Emily W. Murphy ("Murphy") has served as a member of the Board since February 2022. Murphy is a citizen of Alabama.

24. Defendants Aldag, Hamner, Hanna, Dawson, Pitman, Sparks, Stewart, Thompson, Mozingo, and Murphy are sometimes referred to hereinafter as the "Individual Defendants."

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

### A. Fiduciary Duties

25. By reason of their positions as officers, directors, and/or fiduciaries of MPT and because of their ability to control the business and corporate affairs of MPT, at all relevant times, the Individual Defendants owed MPT and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage MPT in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of MPT and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit. Each director and officer of the Company owes to MPT and its stockholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26. The Individual Defendants, because of their positions of control and authority as directors and/or officers of MPT, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial,

and directorial positions with MPT, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

27. To discharge their duties, the officers and directors of MPT were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of MPT were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Exercise good faith to ensure that the Company's communications with the public and with stockholders are made with due candor in a timely and complete fashion; and

(d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B. Duties of the Audit Committee**

28. According to the MPT Audit Committee Charter, members of the committee were responsible for, among other things, the following: (i) "discuss[ing] with management and independent auditors significant financial reporting issues and judgments made in connection with preparation of the Company's financial statements"; (ii) "review[ing] and discuss[ing] with management and the independent auditors the annual audited financial statement and quarterly financial statements"; and (iii) "discuss[ing] with management the Company's major financial risk exposure and the steps management has taken to monitor and control such exposure, including the Company's risk assessment and risk management policies."

29. The Company's Audit Committee Charter states that the committee "shall meet with Company senior management periodically to review," among other things, the following: (i) "Major financial risk exposures"; (ii) "Material legal issues"; (iii) "Risk Management activities"; and (iv) "Business issues which may affect financial results."

## V. SUBSTANTIVE ALLEGATIONS

### A. Background

30. MPT is a self-advised real estate investment trust ("REIT") that was formed to acquire and develop healthcare facilities and lease those facilities to healthcare operating companies under long-term net leases. MPT conducts substantially all of its operations through MPT Operating Partnership, L.P. (the "Operating Partnership"), a Delaware limited partnership.

31. As a REIT, MPT emphasizes certain key performance indicators that investors and analysts following the real estate industry tend to rely on, including net income, funds from operations ("FFO"), and normalized funds from operations ("NFFO"). According to the Company's annual report filed on Form 10-K with the SEC for the reporting period ended December 31, 2022 ("2022 10-K"), MPT defines FFO and NFFO as follows:

> Investors and analysts following the real estate industry utilize funds from operations ("FFO") as a supplemental performance measure. FFO, reflecting the assumption that real estate asset values rise or fall with market conditions, principally adjusts for the effects of GAAP depreciation and amortization of real estate assets, which assumes that the value of real estate diminishes predictably over time. We compute FFO in accordance with the definition provided by the National Association of Real Estate Investment Trusts, or Nareit, which represents net income (loss) (computed in accordance with GAAP), excluding gains (losses) on sales of real estate and impairment charges on real estate assets, plus real estate depreciation and amortization and after adjustments for unconsolidated partnerships and joint ventures.
>
> In addition to presenting FFO in accordance with the Nareit definition, we disclose normalized FFO [NFFO], which adjusts FFO for items that relate to unanticipated or non-core events or activities or accounting changes that, if not noted, would make comparison to prior period results and market expectations less meaningful to investors and analysts.

> We believe that the use of FFO . . . improves the understanding of our operating results among investors and the use of normalized FFO makes comparisons of our operating results with prior periods and other companies more meaningful. . . . [T]he measures do not reflect either depreciation and amortization costs or the level of capital expenditures and leasing costs (if any not paid by our tenants) to maintain the operating performance of our properties, which can be significant economic costs that could materially impact our results of operations.

32. In September 2016, the Company announced that it entered into an agreement to acquire five hospitals from and a limited equity stake in Steward, with Steward agreeing to lease the hospitals back from the Company. From at least 2019 through 2023, Steward was MPT's largest tenant. According to the 2022 10-K, Steward "represented 24.2%" of MPT's total assets, which consists primarily of real estate leases and loans.

33. In July 2019, the Company announced that its Operating Partnership entered into an agreement to acquire fourteen hospitals and two behavioral health facilities from Prospect, with Prospect agreeing to lease those properties back from MPT. According to the Company's annual report filed on Form 10-K with the SEC for the reporting period ended December 31, 2019 ("2019 10-K"), Prospect was MPT's third-largest tenant, representing 9.5% of the Company's gross assets, and Prospect remained MPT's third-largest tenant until fourth quarter 2022.

**B. The Individual Defendants Ignored Red Flags About Prospect's and Steward's Financial Difficulties and Overstated The Company's Assets**

**1. Since 2019, Prospect Was In A "Worsening 'State of Insolvency'" And Its Ability to Meet Debt Obligations Became "More Uncertain With Each Passing Year"**

34. Prior to and following the sale-leaseback transaction with Prospect, several red flags emerged suggesting that Prospect would be unable to meet its financial obligations. Even before MPT acquired assets from Prospect, in March 2019, Moody's Corporation downgraded

Prospect's credit rating to junk bond status.[1] Prospect's financial statements through fiscal year 2019 "revealed a worsening 'state of insolvency' and 'imminent' bankruptcy."[2]

35. On September 30, 2020, *ProPublica* reported that, as a result of Prospect being on "credit hold because they haven't paid their creditors," Prospect's hospitals were lacking funds for basic hospital essentials such as fuel for ambulances as well as "4x4 sponges, dressing for a patient, [and] IV fluids."[3]

36. According to Prospect's financial statements for fiscal year 2020, the company incurred a net loss of approximately $100 million.[4]

37. On June 1, 2021, the Rhode Island Attorney General raised concerns regarding Prospect's financial condition when he issued a decision to conditionally approve a transaction that would allow Prospect to acquire two Rhode Island hospitals (the "AG Decision"). The AG Decision stated, in relevant part:[5]

> ***Our investigation revealed a company whose principals and investors have issued millions of dollars in dividends from a business responsible for the safety-net hospitals and services they own, which has translated into debt held by the entire system, such that liabilities now exceed assets by over $1 billion***. In an ever-changing healthcare market, ***this debt-to-asset ratio raises a concern*** for the

---

[1] *Moody's downgrades Prospect Medical Holdings, Inc.'s CFR to B3; outlook changed to negative*, Moody's (Mar. 28, 2019), https://www.moodys.com/research/Moodys-downgrades-Prospect-Medical-Holdings-Incs-CFR-to-B3-outlook-Rating-Action--PR_397518.

[2] Peter Elkind, *Rich Investors Stripped Millions From a Hospital Chain and Want to Leave It Behind. A Tiny State Stands in Their Way*, PROPUBLICA (Feb. 4, 2021), https://www.propublica.org/article/rich-investors-stripped-millions-from-a-hospital-chain-and-want-to-leave-it-behind-a-tiny-state-stands-in-their-way.

[3] Peter Elkind & Doris Burke, *Investors Extracted $400 Million From a Hospital Chain That Sometimes Couldn't Pay for Medical Supplies or Gas for Ambulances*, ProPublica (Sept. 30, 2020), https://www.propublica.org/article/investors-extracted-400-million-from-a-hospital-chain-that-sometimes-couldnt-pay-for-medical-supplies-or-gas-for-ambulances (internal quotation marks omitted).

[4] *See* State of Rhode Island, Office of Attorney General, Decision (June 1, 2021), pg. 111, 130, *available at* https://riag.ri.gov/sites/g/files/xkgbur496/files/documents/Prospect_Chamber_Ivy_AG_HCA_Decision.pdf.

[5] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

> Attorney General that ***the national company that owns these Rhode Island Hospitals can become unstable***, disrupting and even threatening Rhode Island's third largest hospital system. In other words, PMH is a system that ***is at risk of developing a lack of financial ability to respond to the volatility of the healthcare market***, putting every hospital in its system including our Rhode Island Hospitals at risk of reduction in services, sale, or closure. . . .
>
> ***Money problems have not been limited to PMH's*** [Prospect's] ***subsidiaries; PMH itself has and continues to struggle financially***. See, e.g., PYA Report 19 (explaining that "PMH has reported limited liquidity and a highly leveraged position in recent fiscal years") . . . ***During the 6-year period from Fiscal Year 2015 to Fiscal Year 2020, the company took a cumulative comprehensive loss of $603 million***, and has seen its long-term debt increase from $451 million in Fiscal Year 2015 to almost $1.6 billion in Fiscal Year 2020. . . .
>
> [T]he company's ballooning debt has not always translated into enough liquidity to pay its bills[.] . . . ***[PMH] cannot continue to have significant operating losses and fund necessary capital projects and expect to survive long-term.*** . . . [A]ccumulated debt has . . . turned PMH into a highly leveraged concern. See Carris Report 8, 11 ("[PMH's] rapid growth and increase in debt have strained the company's balance sheet. . . . ***PMH is a highly leveraged company that continues to have large annual losses***."). . . .
>
> ***PMH's ability to meet its medium- and long-term debt obligations are becoming more uncertain with each passing year***. . . .
>
> Another metric used to gauge a company's financial health is the quick ratio. . . . This ratio measures a company's liquidity, that is, its ability to cover short-term financial obligations such as payroll, vendor invoices, and outstanding or impending interest payments. . . . In essence, the lower the value of this ratio, the more likely it is that a company will be unable to pay its bills. . . . PMH's quick ratio was under 1.0 at the end of every Fiscal Year from 2015 to 2020, meaning that ***the company had less than $1 to cover every $1 in short-term financial obligations***. See Carris Report 11 (***expressing concern about liquidity crisis at PMH "within 18 to 24 months"***). . . . The Attorney General sees this as creating a circumstance where ***PMH will not be able to find operational cash when it is needed***. See Carris Report 9 ("***PMH has sold substantially all its real property . . . . There is very little left to leverage to provide liquidity***.")

38. The Rhode Island Attorney General also recognized that a "considerable portion" of Prospects billions in liabilities originated from transactions with MPT. The AG Decision stated, in relevant part:

> ***A considerable portion of the approximately $3.1 billion in liabilities currently on PMH's books is the result of three transactions PMH entered into with***

> ***Medical Properties Trust, Inc. ("MPT") in 2019***. . . . In the first of these, PMH sold its hospitals in Connecticut, Pennsylvania, and all but one of its hospitals in California to MPT for approximately $1.4 billion. . . . MPT then leased these hospitals back to PMH. . . . PMH, according to its agreement with MPT, will pay rent for at least the next 15 years in order to continue operating in facilities it owned until recently. . . . In the second transaction, PMH took out a ~$51 million mortgage on one of its California hospitals; this mortgage is at a 7.5% interest rate per annum and matures in 2034. . . . And in the third transaction, PMH signed a promissory note in exchange for $113 million from MPT, referred to herein as the "TRS Note." . . . Interest on the note is 7.5% per annum and subject to an annual escalation clause. . . . PMH must pay back the full note amount by July 2022. . . . Alternatively, and subject to approval by the Attorney General and DOH pursuant to the HCA, PMH could discharge the note by selling to and leasing back the Rhode Island Hospitals from MPT. . . . ***The Attorney General has addressed this threat to the Rhode Island Hospitals' real estate by prohibiting it from being pledged or used as collateral unless approved by the Attorney General***.

39. The AG Decision relied on an expert witness who concluded that Prospect "is a highly leveraged company that continues to have large annual losses," and that Prospect will face a liquidity crisis "probably within 18 to 24 months."

40. On February 8, 2022, *The Philadelphia Inquirer* reported that Prospect "laid off about 100 [Crozer Health] employees earlier this month, including the executive suite, with the exception of the chief nursing officer. Last month, Prospect closed the maternity ward at Delaware County Memorial and suspended all inpatient services at Springfield."[6]

41. On September 19, 2022, Credit Suisse issued a negative analyst report noting Prospect's "dire financial situation" and its "weak liquidity profile."

42. In October 2022, Pennsylvania's Department of Health officially shutdown operations at Delaware County Memorial because Prospect was inadequately staffing the facility.[7]

---

[6] Harold Brubaker, *Crozer Health layoffs went far deeper than initially reported*, PHILADELPHIA INQUIRER (Feb. 8, 2022), https://www.inquirer.com/business/health/crozer-hospitals-layoffs-prospect-ceo-20220208.html.

[7] *See* John LaPook and Michael Kaplan, *"What they've done is extremely evil": Pennsylvania hospital shutdown spurs questions about private equity in health care*, CBS NEWS (Dec. 6, 2022), https://www.cbsnews.com/news/pennsylvania-delaware-county-memorial-hospital-shutdown-private-equity-health-care/.

**2. MPT Lent An Increasingly Distressed Steward Funds To Pay Rent**

43. According to a June 2021 article published by *The Wall Street Journal* (the "*WSJ*"), "[w]hen Steward ran into financial trouble, Medical Properties Trust provided it [with] more than $700 million through a series of complex deals . . . . [For example, the Company] provided $200 million to buy Steward assets valued at $27 million." The article stated that "Steward lost more than $400 million in 2020 and reported nearly $1 billion of unpaid supplier expenses and other bills."[8]

44. In February 2022, the *WSJ* reported that "[f]ormer MPT employees familiar with the company's transactions said they saw deals with Steward[, MPT's largest tenant,] as a way for MPT to provide it with cash as it notched losses, which in turn helped Steward make its rent payments and kept MPT growing."[9]

**C. The Individual Defendants Caused the Company to Issue False and Materially Misleading Statements That Overstated Its Financials and the Value of Its Real Estate**

45. The Individual Defendants claimed to regularly review the value of the Company's real estate investments. For example, they signed and caused MPT to file its 2018 annual report on Form 10-K on March 1, 2019, which stated, in relevant part:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the future undiscounted cash flows, excluding interest charges, from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as expected future operating income, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition and other factors. If impairment exists due to the inability to recover the carrying value of a facility on

---

[8] Brian Speagle & Laura Cooper, *PE-Backed Hospital Chain Got Help From Major Landlord as Losses Mounted*, WALL. ST. J. (June 18, 2021), https://www.wsj.com/articles/pe-backed-hospital-chain-got-help-from-major-landlord-as-losses-mounted-11624014000.

[9] Brian Speagle, *How a Small Alabama Company Fueled Private Equity's Push Into Hospitals*, WALL. ST. J. (Feb. 14, 2022), https://www.wsj.com/articles/hospitals-private-equity-reit-mpt-steward-11644849598.

an undiscounted basis, . . . an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility.

46. Nevertheless, the Individual Defendants ignored the foregoing red flags and did not report any impairments of those investments for each of fiscal years 2019, 2020, and 2021. Rather, the Individual Defendants caused the Company to issue positive financials backed by strong performances in key metrics.

47. On August 1, 2019, the Individual Defendants caused the Company to issue a press release announcing its second quarter 2019 financial results. For second quarter 2019, the Company reported net income of $79.4 million, FFO of approximately $119.5 million, and NFFO of a $120.9 million.

48. On October 31, 2019, the Individual Defendants caused the Company to issue a press release announcing its third quarter 2019 financial results. For third quarter 2019, the Company reported net income of $89.8 million, FFO of approximately $139.3 million, and NFFO of $147.5 million.

49. On February 6, 2020, the Individual Defendants caused the Company to issue a press release announcing its fourth quarter 2019 and full year 2019 financial results. For fourth quarter 2019, the Company reported net income of $130 million, FFO of approximately $161.7 million, and NFFO of $171 million. For full year 2019, the Company reported net income of $375 million, FFO of approximately $535.8 million, and NFFO of $557 million.

50. On February 27, 2020, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the reporting period ended December 31, 2019 (*i.e.,* the 2019 10-K). The annual report was signed by defendants Aldag, Hamner, Hanna, Dawson, Pitman, Sparks, Stewart, and Thompson. The 2019 10-K stated, in relevant part: "***We do not believe that the value of any of our facilities was impaired at December 31, 2019;*** however, given

the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken."

51. On April 29, 2020, the Individual Defendants caused the Company to issue a press release announcing its first quarter 2020 financial results. For first quarter 2020, the Company reported net income of $81 million, FFO of approximately $168.7 million, and NFFO of $191.2 million.

52. On July 30, 2020, the Individual Defendants caused the Company to issue a press release announcing its second quarter 2020 financial results. For second quarter 2020, the Company reported net income of $109.5 million, FFO of approximately $183.9 million, and NFFO of $199.6 million.

53. On October 29, 2020, the Individual Defendants caused the Company to issue a press release announcing its third quarter 2020 financial results. For third quarter 2020, the Company reported net income of $131.1 million, FFO of approximately $212.4 million, and NFFO of $220.7 million.

54. On February 4, 2021, the Individual Defendants caused the Company to issue a press release announcing its fourth quarter 2020 and full year 2020 financial results. For fourth quarter 2020, the Company reported net income of $110 million, FFO of approximately $192.6 million, and NFFO of $220 million. For full year 2020, the Company reported net income of $431 million, FFO of approximately $757.7 million, and NFFO of $557 million.

55. On March 1, 2021, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the reporting period ended December 31, 2020 ("2020 10-K"). The 2020 10-K was signed by defendants Aldag, Hamner, Hanna, Dawson, Mozingo, Pitman, Sparks, Stewart, and Thompson. It stated: "We do not believe that the value of any of our facilities

was impaired at December 31, 2020; however, given the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken."

56. On April 29, 2021, the Individual Defendants caused the Company to issue a press release announcing its first quarter 2021 financial results. For first quarter 2021, the Company reported net income of $164 million, FFO of approximately $251 million, and NFFO of $244 million.

57. On July 29, 2021, the Individual Defendants caused the Company to issue a press release announcing its second quarter 2021 financial results. For second quarter 2021, the Company reported net income of $115 million, FFO of approximately $205.6 million, and NFFO of $251 million.

58. On October 28, 2021, the Individual Defendants caused the Company to issue a press release announcing its third quarter 2021 financial results. For third quarter 2021, the Company reported net income of $171 million, FFO of approximately $260 million, and NFFO of $263 million.

59. On February 3, 2022, the Individual Defendants caused the Company to issue a press release announcing its fourth quarter 2022 and full year 2022 financial results. For fourth quarter 2021, the Company reported net income of $207 million, FFO of approximately $259.4 million, and NFFO of $279 million. For full year 2021, the Company reported net income of $656 million, FFO of approximately $976 million, and NFFO of $1,036 million.

60. On March 1, 2022, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the reporting period ended December 31, 2021 ("2021 10-K"). The 2021 10-K was signed by defendants Aldag, Hamner, Hanna, Dawson, Mozingo, Pitman, Sparks, Stewart, and Thompson. It stated: "We do not believe that any of our facilities were

impaired at December 31, 2021; however, given the highly specialized aspects of our properties, no assurance can be given that future impairment charges will not be taken."

61. On April 28, 2022, the Individual Defendants caused the Company to issue a press release announcing its first quarter 2022 financial results. For first quarter 2022, the Company reported net income of $632 million, FFO of approximately $279.1 million, and NFFO of $282 million.

62. On August 3, 2022, the Individual Defendants caused the Company to issue a press release announcing its second quarter 2022 financial results. For second quarter 2022, the Company reported net income of $190 million, FFO of approximately $274.9 million, and NFFO of $275 million.

63. On October 27, 2022, the Individual Defendants caused the Company to issue a press release announcing its third quarter 2022 financial results. For third quarter 2022, the Company reported net income of $222 million, FFO of approximately $252 million, and NFFO of $272 million.

64. By this time, Prospect had suspended operations at one of its facilities in Pennsylvania by order of the state regulator. During the Company's third quarter 2022 earnings call held on October 27, 2022, defendant Aldag acknowledged that "[t]he Pennsylvania facilities are not where we would like them to be, [and we are] certainly disappointed in where they are." However, according to the Company's quarterly report filed on November 9, 2022, MPT did not report any impairment charges for third quarter 2022.

65. The above statements and financial information provided by the defendants were materially misleading because they failed to disclose that: (i) Prospect and Steward were financially distressed and unable to meet their financial obligations under their leases; (ii) the

Company engaged in noncommercial transactions with Prospect and Steward; (iii) the value of the Company's assets was significantly overstated; and (iv) as a result, the Company's financial results were materially misleading.

**D. The Truth Slowly Emerges**

66. On January 26, 2023, Viceroy Research published a report entitled "Medical Properties (dis)Trust" (the "Viceroy Report"). According to the report, to address certain of MPT's largest tenants' weak liquidity and financial conditions and avoid required asset impairment charges as well as write-offs of losses from rent receivables, MPT purportedly engaged in uncommercial round-trip transactions with those tenants to allow them to meet their short-term lease payment obligations.

67. The Viceroy Report stated that MPT engaged in four types of improper, uncommercial transactions:

(a) "uncommercial sale-leaseback transactions," which involve vendors becoming the tenant of the property that they sell to MPT. Although sale-leasebacks are not inherently noncommercial, MPT purportedly "almost exclusively engages in these transactions with counterparties who are in financial ruin," and, "[d]espite this, MP[T][] appear[s] to constantly overpay for fire sale assets, sometime by as much as 10x, which in-turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term."(ii) "Cash-Giveaways; (iii) "Bailouts"; and (iv) "Capex Assistance & Fake Builds."

(b) "Cash-Giveaways," through which MPT essentially gave away "hundreds of millions of dollars in what appear to be fraudulent transactions."

(c) "various run-of-the-mill bailout transactions," through which MPT would "acquire equity in failing operators or issue them loans in order to mask uncollectable rent via roundtripping revenues and, consequently, avoid impairment of their assets."

(d) "'fake' projects" to siphon money away from the Company to distressed tenants in the form of "Capex Assistance."

68. The Viceroy Report covers nine of purportedly many uncommercial MPT transactions. Of these nine transactions, five involved Steward. The report claims that these transactions were as follows:

(a) MPT loaned Steward $1.4 billion to purchase a Salt Lake City portfolio of nineteen hospitals. "$700 million . . . of this loan was immediately extinguished in exchange for 9 [of these] properties" from Steward, and the remaining $700 million was extinguished in exchange for only two of the facilities, which were conservatively worth $250 million in total, and $200 million in cash. As a result, Steward effectively received the seven remaining hospitals, which were worth $750 million, for free;

(b) MPT gave away $57.8 million when, in 2018, the Company provided "additional consideration of $42.8 m[illion]" to Steward after paying off mortgages on and taking ownership of four Massachusetts facilities from Steward. The remaining $15 million comes from a "ping-pong exchange" in which MPT sold a Massachusetts hospital to Steward, only to reacquire the property months later for $15 million more than the Company sold it for;

(c) MPT claimed to have "invested in the real estate of three . . . hospitals in Colombia for approximately $135 million" through a joint venture with Steward. However, the local operator that the joint venture allegedly purchased the hospitals from shows that it only sold its operations and two of three hospitals for approximately $40 million. The remaining hospital was leased as a result of a sale-leaseback transaction, and this sale-leaseback liability amounted to approximately $35 million. Of the $135 million purported investment, only $75 million is accounted for;

(d) MPT funneled $173 million to Steward after purchasing a 49% equity stake in a joint venture owned by MPT and Steward for $205 million. Of the $205 million, $200 million was paid to Steward in exchange for three Malta hospitals worth $27 million; and

(e) as a result of equity contributions from various transactions, MPT amassed a "9.9% equity stake in Steward valued at $150m[illion]" according to MPT's 2018 annual report. However, following a series of transactions which involved MPT making a $335 million loan to Steward in January 2021, it appeared that MPT overvalued its stake by approximately $115 million.

69. One of the nine MPT transactions covered by the Viceroy Report involved Prospect. Specifically, the report states that MPT "held a promissory note for $113m[illion] secured against Prospect's Rhode Island properties. The note's maturity was set for "the earlier of August 2022 or the conversion to and sale-leaseback of the properties in Rhode Island." "Rhode-Island regulators approved" a management buyout of Prospect contingent on a five-year extension of the note and the removal of the sale-leaseback option. With Prospect's business in financial distress, "conflicting information as to whether . . . the $113m . . . note is actually secured against the relevant" Rhode Island hospitals," and with the Rhode Island "Attorney General impos[ing][] unprecedented conditions on hospital ownership change to ensure future operations," the $113 million loan appeared "unrecoverable."

70. On February 23, 2023, before the market closed, MPT issued a press release in which it announced a $283 million impairment charge in the fourth quarter of 2022 consisting of: (i) "a real estate impairment of approximately $171 million related to four [Pennsylvania] properties leased to Prospect," and (ii) "a write-off of roughly $112 million in unbilled Prospect

rent." On this news, the Company's stock price fell approximately 8.7% to close at $11.14 per share on February 23, 2023, on unusually heavy trading volume.

71. The same day, the Company filed its annual report on form 10-K with the SEC for the reporting period ended December 31, 2022 ("2022 10-K"). The 2022 10-K stated that "[u]ntil the 2022 fourth quarter, Prospect was current on its rent and interest obligations under the various agreements. However, with rent and interest now past due . . . , we recorded an approximate $280 million impairment charge in the 2022 fourth quarter."

72. Also on February 23, 2023, the Company's Co-Founder, Executive Vice President, Chief Operating Officer, and Secretary, Emmett E. McLean, announced his retirement.

73. On November 9, 2023, the Company began to reveal the effect Steward's financial distress on the Company, waiting until Steward was *actually defaulting* on rent payments to do so. That day, the Company filed its quarterly report on Form 10-Q for the reporting period ended September 30, 2023 ("3Q23 Report"), in which it announced that only "a portion of [Steward's] October rent was paid timely" because "Steward's cash flows from operations have been impacted by challenges related to revenue cycle management and a backlog of accounts payable."

74. On January 4, 2024, after the market closed, MPT issued a press release entitled "Medical Properties Trust Provides Update on Steward Health Care." The Company revealed that, as a result of Steward's uncertain liquidity status, "the Company expects to record a non-cash charge in the fourth quarter of 2023 to write off consolidated straight-line rent receivables of approximately $225 million, its approximately $25 million share of straight-line rent receivables related to the unconsolidated Massachusetts partnership and consolidated unpaid rent receivables of approximately $100 million." MPT stated that "[t]here can be no assurance that . . . the Company will recover all of its deferred rent and loans outstanding to Steward," and that it "cannot

be assured that Steward will make all scheduled lease payments throughout the remaining approximate 22-year fully extended term of its master lease." Noting that Steward was "approximately $50 million" behind on rent, the Company claimed that "Steward recently informed MPT that its liquidity has been negatively impacted by significant changes to vendors' payment terms." On this news, the Company's stock price fell 29% to close at $3.55 per share January 5, 2024, on unusually heavy trading volume.

### E. Defendants Aldag, Hamner, and Hanna Sold More Than $57 Million in MPT Stock While in Possession of Material Non-Public Information

#### 1. Defendant Aldag

75. Defendant Aldag is the Company's founder and has served as the Company's CEO since 2003. Thus, he has a sophisticated understanding of the Company's financial results and the value of its real estate assets.

76. As set forth herein, defendant Aldag possessed material negative nonpublic information which he knew was being concealed from investors, including the financial distress of two of MPT's larger tenants and the value of the Company's real estate assets.

77. Defendant Aldag consciously acted to exploit his knowledge by selling nearly $37.6 million in MPT stock for his substantial benefit:

| Date | Number of Shares | Average Price Per Share | Gross Proceeds |
|---|---|---|---|
| 10/10/2019 | 101,964 | $19.78 | $2,016,847.92 |
| 7/7/2020 | 156,569 | $18.60 | $2,912,183.40 |
| 7/8/2020 | 244,406 | $18.43 | $4,504,402.58 |
| 3/30/21 | 710,000 | $21.21 | $15,059,100.00 |
| 3/30/22 | 615,000 | $21.33 | $13,117,950.00 |
| **Total:** | **1,827,939** | | **$37,610,484.00** |

78. Defendant Aldag thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth about the financial condition of its tenants and the value of its real estate assets, among other things.

**2. Defendant Hamner**

79. Defendant Hamner is one of the Company's co-founders and has served as the Company's CFO since September 2003. Thus, he has a sophisticated understanding of the Company's financial results and the value of its real estate assets.

80. As set forth herein, defendant Hamner possessed material negative nonpublic information which he knew was being concealed from investors, including the financial distress of two of MPT's larger tenants and the value of the Company's real estate assets.

81. Defendant Hamner consciously acted to exploit his knowledge by selling nearly $18.6 million in MPT stock for his substantial benefit:

| Date | Number of Shares | Average Price per Share | Gross Proceeds |
|---|---|---|---|
| 8/7/2019 | 70,000 | $17.77 | $1,243,900.00 |
| 9/25/2019 | 77,500 | $19.43 | $1,505,825.00 |
| 7/2/2020 | 220,000 | $19.12 | $4,206,400.00 |
| 2/24/2021 | 250,000 | $22.49 | $5,622,500.00 |
| 4/7/2022 | 285,000 | $21.04 | $5,996,400.00 |
| **Total:** | **902,500** | | **$18,575,025.00** |

82. Defendant Hamner thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth about the financial condition of its tenants and the value of its real estate assets, among other things.

**3. Defendant Hanna**

83. Defendant Hanna has served as the Company's CAO since January 2016. Thus, he has a sophisticated understanding of the Company's financial results and the value of its real estate assets.

84. As set forth herein, defendant Hanna possessed material negative nonpublic information which he knew was being concealed from investors, including the financial distress of two of MPT's larger tenants and the value of the Company's real estate assets.

85. Defendant Hanna consciously acted to exploit his knowledge by selling approximately $1 million in MPT stock for his substantial benefit:

| Date | Number of Shares | Average Price per Share | Gross Proceeds |
|---|---|---|---|
| 8/4/2020 | 17,500 | $20.02 | $350,350.00 |
| 3/17/2021 | 33,000 | $21.32 | $703,560.00 |
| **Total** | **50,500** | | **$1,053,910.00** |

86. Defendant Hanna thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth about the financial condition of its tenants and the value of its real estate assets, among other things.

## VI. DAMAGES TO THE COMPANY

87. As a direct and proximate result of the Individual Defendants' conduct, MPT has been seriously harmed and will continue to be. Such harm includes, but is not limited to the following:

(a) Defendants Aldag's, Hamner's, and Hanna's ill-gotten gains from their insider trading;

(b) Any funds paid to settle the Securities Class Action; and

(c) Costs incurred from compensation and benefits paid to the defendants who have breached their duties to MPT.

88. In addition, MPT's business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired. The Company still has not fully admitted the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

89. The actions complained of herein have irreparably damaged MPT's corporate image and goodwill. For at least the foreseeable future, MPT will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

behavior and have misled the investing public, such that MPT's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII. DERIVATIVE AND DEMAND ALLEGATIONS

90. Plaintiff brings this action derivatively in the right and for the benefit of MPT to redress injuries suffered, and to be suffered, by MPT as a direct result of the wrongdoing alleged herein. MPT is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

91. Plaintiff will adequately and fairly represent the interests of MPT in enforcing and prosecuting its rights.

92. Plaintiff has continuously been a shareholder of MPT at times relevant to the wrongdoing complained of and is a current MPT shareholder.

93. On January 16, 2024, Plaintiff made a demand on the Board to investigate and remedy the violations of law described herein as required by Maryland law (the "Demand"). A true and correct copy of the Demand is attached hereto as Exhibit 1. The Demand states that Mr. Dranch has owned MPT shares since April 2021. The Demand alleges that, as detailed above, MPT ignored red flags concerning certain of its largest tenants' financial distress, failed to timely record write-offs of rent receivables and impairment charges, and issued public disclosures that overstated the Company's financials and the value of its real estate.

94. On March 11, 2024, on behalf of the Board, Wachtell, Lipton, Rosen & Katz LLP ("Wachtell") responded to the Demand, stating that resolution of Plaintiff's Demand is "premature at this time and therefore" the Board chose "to defer consideration of the [D]emand pending further developments in" related proceedings, including the Securities Action and other pending derivative actions. A true and correct copy of this response is attached hereto as Exhibit 2.

95. On April 4, 2024, counsel for Plaintiff replied to Wachtell, stating that the March letter "makes no attempt to suggest that the directors" who decided to defer consideration of the Demand "were disinterested and independent from the underlying alleged misconduct." A true and correct copy of this response is attached hereto as Exhibit 3. Wachtell's letter "merely references 'deliberation' and does not make clear what the Board considered in reaching its decision." *Id.* Moreover, "the Board decision to defer acting in response to the Demand raises the likelihood of prejudice to the Company's claims due to the passage of time." *Id.* This increasing likelihood of prejudice is because there purportedly were "several red flags dating back to 2019 that put the Board on notice that the Company's lessees would be unable to meet their financial obligations" and "the limitations period for potential [breach of fiduciary duty] claims is as short as 3 years." *Id.*

96. On April 26, 2024, Wachtell responded to Plaintiff counsel, reiterating the Board's position as set forth in its prior letter. A true and correct copy of this response is attached hereto as Exhibit 4.

97. The Company's response devoid of any steps taken by the Board, as the Demand requested, to "investigate whether any of MPT's officers and directors committed non-exculpable breaches of fiduciary duty and/or other violations of applicable law." In fact, the response states that the Board will "defer further consideration of the [D]emand at this time," and will revisit the Demand "when circumstances permit." Moreover, the response states that "[i]n the event that the Board determines that any claims need to be preserved, the Board will take steps it determines to be appropriate."

98. The Company's response does not comport with Maryland law. *See Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 344 (Md. 2009) ("Once demand is made, the corporation's

board of directors ***must conduct an investigation into the allegations*** in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation.").

99. The Board did not delegate an investigation to a special committee of disinterested directors, engage legal and/or financial experts (to Plaintiff's knowledge), or issue a determination as to whether defendants, who comprise the entirety of the Board, properly exercised their fiduciary duties. These failures are not a proper exercise of business judgment. Therefore, the Demand was wrongfully refused.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

100. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101. The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MPT's business and affairs, particularly with respect to issues as fundamental as public disclosures.

102. The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

103. In breach of their fiduciary duties owed to MPT, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

104. In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall prospects.

105. As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, MPT has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against Defendants Aldag, Hamner, and Hanna for Breach of Fiduciary Duty for Insider Selling

106. Plaintiff repeats and realleges each and every allegation contained above, as though fully set forth herein.

107. Defendants Aldag, Hamner, and Hanna are fiduciaries of MPT, possessed material non-public information ("MNPI") of MPT, and used that information improperly to profit from sales of MPT stock. When defendants Aldag, Hamner, and Hanna directed the stock sale set forth above, they were motivated to do so, in whole or in part, by the substance of the MNPI they possessed.

108. The MNPI was a proprietary asset belonging to the Company that must be used to benefit the Company and all its shareholders on equal terms. Instead, Aldag, Hamner, and Hanna misappropriated this information entirely for his own benefit.

109. When defendants Aldag, Hamner, and Hanna sold their stock, they knew that the investing public was unaware of the negative MNPI that they possessed. They also knew that if the information was disclosed, the market price of MPT would be significantly lower. Defendants Aldag, Hamner, and Hanna timed their stock sale to take advantage of the public's ignorance of the concealed facts and obtain a higher price for the stock they sold. They thereby benefited by misappropriating MPT's MNPI.

110. No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**COUNT III**

**Against Defendants Aldag, Hamner, and Hanna for Unjust Enrichment**

111. Plaintiff repeats and realleges each and every allegation set forth above, as though fully set forth herein.

112. Defendants Aldag, Hamner, and Hanna were unjustly enriched by their wrongful acts at the expense of and to the detriment of MPT as a result of selling their MPT stock at an inflated price on the basis of and prior to the public release of adverse MNPI.

113. Under the circumstances, it would be against the principles of equity and good conscience to allow defendants Aldag, Hamner, and Hanna to retain these benefits.

114. No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of MPT, demands judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of MPT and that Plaintiff is an adequate representative of the Company;

B. Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties;

C. Directing MPT to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MPT and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over financial reporting;

2. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3. a proposal to strengthen MPT's oversight of its disclosure procedures;

4. a provision to control insider transactions; and

5. a provision to permit the stockholders of MPT to nominate at least three candidates for election to the Board;

D. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of MPT has an effective remedy;

E. Awarding to MPT restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

F. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Respectfully submitted,

**BROWN GOLDSTEIN LEVY LLP**

/s/
Dana Whitehead McKee, Federal Bar No. 04447
Michael R. Abrams, Federal Bar No. 30426
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202

Telephone: (410) 962-1030
Facsimile: (410) 385-0869
dwm@browngold.com
mabrams@browngold.com

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels (*pro hac vice to be filed*)
Jacob M. Shooster (*pro hac vice to be filed*)
745 Fifth Avenue, 5th Floor
New York, NY 10151
Telephone: (212) 935-7400
Facsimile: (212) 756-3630
bsachsmichaels@glancylaw.com
jshooster@glancylaw.com

Robert V. Prongay (*pro hac vice to be filed*)
Pavithra Rajesh (*pro hac vice to be filed*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
prajesh@glancylaw.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Gary Dranch, do hereby verify that I am a holder of stock of Medical Properties Trust, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge. With respect to the remainder of the averments, all are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: June 20, 2024

Gary Dranch